The MERCHANTS NATIONAL BANK
OF MOBILE, et al.,
Plaintiffs-Appellees,

v.

The DREDGE GENERAL G. L.
GILLESPIE, Etc., et al.,
Defendants-Appellants.

No. 80–3349.

United States Court of Appeals,
Fifth Circuit.*
Unit A

Dec. 18, 1981.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Charles G. Black, Memphis, Tenn., for defendants-appellants.

David R. Owen, Baltimore, Md. (David J. Sharpe, George Washington University Law School, Washington, D. C., John W. Sims and J. Dwight LeBlanc, Jr., New Orleans, La., on brief) for the Maritime Law Assoc. of the U. S., amicus curiae.

Alex T. Howard, Jr., Mobile, Ala., for Merchants National Bank.

Wm. R. Forrester, Jr., Scott Selden Partridge, W. L. West, New Orleans, La., for Dravo Leasing Co.

Before BROWN and TATE, Circuit Judges, and SMITH **, District Judge.

JOHN R. BROWN, Circuit Judge:

This case presents, for the first time to any U.S. Court of Appeals,*** the issue of the Constitutionality of Admiralty Rules C and E, concerning *in rem* seizure of a vessel without a preliminary judicial hearing. We find this historical procedure Constitutional and affirm.

---

** District Judge of the Northern District of Mississippi, sitting by designation.

*** While this opinion was circulating among the panel members, the Court of Appeals for the Fourth Circuit issued its opinion in *Amstar Corp. v. S/S ALEXANDROS T,* 664 F.2d 904 [4th Cir. 1981], holding that Rule C satisfies the minimum requirements of the due process clause, a result which we embrace.

### A Tale of Two Plaintiffs

The consolidated cases on appeal before this Court were instituted by two plaintiffs to foreclose preferred ship mortgages. Dravo Leasing Company filed the first complaint *in rem* against the barge ARLINGTON, pursuant to Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims (Rule C), and *in personam* against the vessel's owner. The Merchants National Bank of Mobile filed the remainder of the actions consolidated in this controversy against eight vessels *in rem*, the eight vessel owners *in personam*, and a Mr. Bierman, the owner of several corporations involved in the gravel operation where these vessels were located. For the remainder of this opinion, Dravo and Merchants National will be referred to collectively as "lienors", and the owners of all the vessels, as well as Mr. Bierman, will be collectively referred to as "claimants".

All of the vessels were physically arrested on July 18, 1979. The lienors simultaneously filed Motions for the Interlocutory Sale of the Vessels. The claimants responded to the above foreclosure action by filing a motion to vacate and invalidate the seizure of the vessels, an opposition to the motion for interlocutory sale, and answers and affirmative defenses to the lienors' complaints in a multi-count, multi-party counterclaim.

The District Court held a two-day evidentiary hearing on December 14 and 28, 1979. Subsequently, District Judge Hunter, a distinguished and highly experienced admiralty judge, was assigned to the case, and on April 25, 1980, the District Court denied claimants' motion to vacate the seizure and entered an order of interlocutory sale. These rulings of April 25, 1980, are the subject of this appeal.

No one denies that the claimants executed (i) demand promissory notes payable to one or both of the lienors and (ii) preferred ship mortgages as security for the indebtedness created by those notes. The funds were to be used in the construction and operation of a floating gravel operation on the Mississippi River. The claimants allege that the lienors and several other named counter-defendants conspired to defraud them and that the lienors' seizure of the vessels in furtherance of such schemes prevented claimants from paying back portions of the outstanding indebtedness. Moreover, the claimants emphasize that the lienors seized the vessel without prior notice to them and without prior judicial participation.

The claimants raise two significant questions on this appeal: *First,* they urge that the prejudgment seizure and sale procedures of Rules C and E[1] violate the proce-

1. Rule C.—ACTIONS IN REM: SPECIAL PROVISIONS

(1) An action in rem may be brought:

(a) To enforce any maritime lien;

(b) Whenever a statute of the United States provides for maritime action in rem or a proceeding analogous thereto.

. . . .

(2) *Complaint.* In actions in rem the complaint shall be verified on oath or solemn affirmation. It shall describe with reasonable particularity the property that is the subject of the action and state that it is within the district or will be during the pendency of the action. In actions for the enforcement of forfeitures for violation of any statute of the United States the complaint shall state the place of seizure and whether it was on land or on navigable waters, and shall contain such allegations as may be required by the statute pursuant to which the action is brought.

(3) *Process.* Upon the filing of the complaint the clerk shall forthwith issue a warrant for the arrest of the vessel or other property that is the subject of the action and deliver it to the marshal for service. If the property that is the subject of the action consists in whole or in part of freight, or the proceeds of property sold, or other intangible property, the clerk shall issue a summons directing any person having control of the funds to show cause why they should not be paid into court to abide the judgment.

. . . .

Rule E.—ACTIONS IN REM AND QUASI IN REM: GENERAL PROVISION

. . . .

(2) Complaint; Security.

(a) *Complaint.* In actions to which this rule is applicable the complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading.

(b) *Security for Costs.* Subject to the provisions of Rule 54(d) and of relevant statutes, the

dural due process requirements of the Fifth Amendment, and *second*, that the District Court's order of interlocutory sale was erroneous since none of the standards of Rule E(9)(b) of the Supplemental Rules for Certain Admiralty Maritime Claims, allowing interlocutory sale,[2] had been met.

### Was the Interlocutory Sale Justifiable?

For the reasons set forth below, we are convinced that both the evidence presented to the District Court and the findings of that court more than justify the interlocutory sale. The attack argues that (i) the vessels are not subject to deterioration or injury by being detained in custody, (ii) the District Court's conclusion that the costs of seizure are excessive or disproportionate was clearly erroneous,[3] and (iii) the District Court's conclusion that there has been an unreasonable delay in securing the release of the seizure is clearly erroneous because claimants timely filed their motion to vacate and $3 million cash would have been required to procure a bond for releasing the vessels. These three arguments parallel the three circumstances under Rule E(9)(b) in which an interlocutory sale is appropriate.[4]

In order to prevail, the lienors need only show one of the three criteria.

In our review of the District Court's judgment, we are bound under F.R.Civ.P. 52(a) to accept its findings of fact "unless clearly erroneous." *See* 5A *Moore's Federal Practice* ¶ 52.03. Findings are "clearly erroneous" in this Circuit where such findings are without substantial evidence to support them, where the District Court misapprehended the effect of the evidence, and if the force and effect of testimony considered as a whole discloses that the the finding is so against the great preponderance of the credible testimony that it does not reflect the truth of the case. *Western Cottonoil Co. v. Hodges*, 218 F.2d 158, 161 (5th Cir. 1954).

The District Court made detailed findings. Several of the barges were taking on water and had to be pumped. The vessels were deteriorating, and if allowed to continue in their laid-up condition, the machinery on board would need to be completely overhauled. The hulls of all the vessels and the superstructures of all but one of the vessels are steel, and were not being maintained to prevent deterioration. The total expenses attributable to the vessels during

court may, on the filing of the complaint or on the appearance of any defendant, claimant, or any other party, or at any later time, require the plaintiff, defendant, claimant, or other party to give security, or additional security, in such sum as the court shall direct to pay all costs and expenses that shall be awarded against him by any interlocutory order or by the final judgment, or on appeal by any appellate court.
F.R.Civ.P., Supplemental Rules for Certain Admiralty and Maritime Claims.

2. Rule E(9): Disposition of Property; Sales.
. . . .
(b) *Interlocutory Sales.* If property that has been attached or arrested is perishable, or liable to deterioration, decay, or injury by being detained in custody pending the action, or if the expense of keeping the property is excessive or disproportionate, or if there is unreasonable delay in securing the release of property, the court, on application of any party or of the marshal, may order the property or any portion thereof to be sold; and the proceeds, or so much thereof as shall be adequate to satisfy any judgment, may be ordered brought into court to abide the event

of the action; or the court may, on motion of the defendant or claimant, order delivery of the property to him, upon the giving of security in accordance with these rules.
. . . .
F.R.Civ.P., Supplemental Rule for Certain Admiralty and Maritime Claims.

3. The claimants argue that the District Court improperly aggregated the values of all of the vessels and compared that total to the total predicted costs of seizure and outstanding indebtedness. The procedure was allegedly improper because the various promissory notes are not completely secured by all of the vessels.

4. Rule E(9)(b) provides that if "property that has been attached or arrested is . . . liable to deterioration, decay, or injury by being detained in custody pending the action, or if the expense of keeping the property is excessive or disproportionate, or if there is unreasonable delay in securing the release of property, the Court, on application of any party or of the Marshal, may order the property or any portion thereof to be sold . . . ."

seizure had been over $17,000 per month.[5] The owners of the vessels never posted bond, entered into any stipulation or otherwise attempted to secure the release of the vessels during the eight months after the seizure, thus constituting an unreasonable delay in securing their release. *Merchants National Bank of Mobile v. Dredge General G. L. GILLESPIE*, 488 F.Supp. 1302, 1307–08 (W.D.La.1980).

The claimants challenged these findings of fact, particularly in light of the District Court's consideration of all of the vessels collectively in its analysis of deterioration and the expense of keeping the vessels in custody. Moreover, they argue that their filing of a Motion to Vacate and Invalidate the Seizure, as well as their efforts to secure a bond, demonstrate that there has been no "unreasonable delay" in securing the release of the seized vessels.

■ Expert evidence was presented to the District Court, suggesting that if any of the vessels was permitted to lay idly without routine maintenance and without having been properly prepared for lay-up, the engine(s) might rust and freeze up, necessitating costly overhaul. The engines were not properly conditioned for lay-up and they did not receive the necessary maintenance during lay-up. Moreover, credible expert testimony showed that the electric equipment on each of the vessels was susceptible to corrosion, rust and general deterioration. Likewise, the hulls of all of the vessels and most of the superstructures were subject to rusting, and had not been properly painted. The court's assessment that each of the vessels was "liable to deterioration ... or injury by being detained in custody" was not clearly erroneous.

Rule E(9)(b) also permits an interlocutory sale if the costs of the seizure are "excessive or disproportionate." The evidence revealed that the costs attributable to the vessels during seizure exceeded $17,000 per month, all of which had to come out of the lienors' pockets with uncertain hope of reimbursement. We do not think that the District Court erred in concluding that these expenses are excessive.

Finally, we do not hold clearly erroneous the District Court's finding that there was an unreasonable delay in securing the release of the vessels. The claimants, it was found, never posted bond, entered into any stipulation, or otherwise attempted to secure the release of the vessels pursuant to Rule E(5).[6] For this and the other reasons noted above, we find that the interlocutory sale was justifiable.

### The Constitutionality of Rules C(3) and E(9)

This Constitutional question is, of course, of primary importance to this controversy. If the prejudgment seizure and sale provisions of the maritime rules violate due process, it would not prove necessary to consider the question of the justifiability of the interlocutory sale. We have, nevertheless, reserved this important discussion for the remainder of this opinion, and for the reasons set forth below, we conclude that the maritime procedures at issue are Constitutionally sufficient.

Although Rule C(3)[7] was promulgated in 1966 as an essential part of the integration of Admiralty Rules with the Federal Rules of Civil Procedure, it has roots deep in the maritime history of the nation.[8] For this

---

5. $7000 per month was spent on guard fees, pump rentals, fees to those pumping water out of the vessels, and fuel. $10,000 per month was spent on insurance coverage.

6. Rule E(5) provides for the release of property by (a) special bond, (b) general bond, and (c) consent or stipulation.

7. See Note 1, *supra.*

8. The Admiralty Rules of Practice of 1844 contain provisions substantially identical to the

seizure *in rem* provisions of Rule C. *See* Rules of Practice for the Courts of Admiralty VIII, IX, & XI, 44 U.S. (3 How.) x, xi (1845). And the roots of this time-honored procedure do not stop there. As stated by F. L. Wiswall, in *The Development of Admiralty Jurisdiction and Practice since 1800* (1970),

· For centuries, the ability to proceed in the Admiralty Court directly against a ship has been the distinguishing feature of the Admiralty jurisdiction. The action *in rem* seems to have been employed in Admiralty before

reason, we must not take lightly the present challenge. It is well established that the Constitution is sufficiently flexible to permit its requirements to be considered in relation to the legal and commercial contexts in which they are invoked. *See Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 610, 94 S.Ct. 1895, 1901, 40 L.Ed.2d 406, 415 (1974), and cases cited therein. Moreover, as fundamental fairness in practical application is the primary criterion of due process, this Court holds that Rule C meets that criterion in the context of admiralty.

For a practice promulgated initially by Federal Courts, and applied and enforced by Federal Courts for well over a century, the words of Mr. Justice Holmes, in *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31, 43 S.Ct. 9, 10, 67 L.Ed. 107, 112 (1922), are timely:

> The 14th Amendment, itself a historical product, did not destroy history for the states, and substitute mechanical compartments of law, all exactly alike. If a thing has been practiced for 200 years by common consent, it will need a strong case for the 14th Amendment to affect it . . . .

What he said of the Fourteenth Amendment applies equally to the present controversy over the due process requirements of the Fifth Amendment. We deal here not with a merely historical abstraction that should be preserved on the basis of its past utility, but with a practical, problem-solving device that retains its importance in contemporary admiralty law.

At the outset, we distinguish between *in personam* and *in rem* actions in admiralty and limit the present discussion to a consideration of the constitutionality of seizure of a vessel under Rule C in an *in rem* action.[9] Also, this controversy arises under a preferred ship mortgage in favor of lienors, and our consideration thus involves the uniform rules set forth by Congress establishing enforcement and foreclosure procedures for preferred ship mortgages. Finally, we emphasize that the present controversy arose in a jurisdiction with a local admiralty rule (21) that provides for a prompt post-seizure hearing.

### Procedural Safeguards Under The Admiralty Rules

The claimants urge that the prejudgment seizure procedures under Rule C(3) unconstitutionally fail to provide the safeguards required by the due process clause of the Fifth Amendment. We will begin our discussion by outlining the extensive protections available to claimants under the Admiralty rules.

Under the requirements of Rule C(2), process will only issue upon the basis of a verified complaint. Rule C(6), providing for a claimant's answer to the complaint, undoubtedly implies that a hearing will be

---

the Elizabethan era, but only by the 19th century had it become the dominant Admiralty procedure; and it was in the mid-19th century—as a result of the dominance of the action *in rem*—that the modern theory of maritime liens [rights against the ship] began to evolve . . . . (footnotes omitted) *Id.* at 155 The Admiralty Rules of Practice promulgated by the U.S. Supreme Court in 1920 likewise contained procedures identical to those found in the 1966 Rules. *See, e. g.*, Admiralty Rules of Practice 1 (Process on Filing Libel; Service by the Marshal); 10 ("In all cases of seizure, and in other suits and proceedings *in rem*, the process . . . shall be by warrant of arrest of the ship . . . and the marshal shall thereupon arrest and take the ship . . . into his possession for safe custody, and shall cause public notice thereof. . . . "). Moreover, the Supplemental Rules promulgated in 1966 were not intended to alter the admiralty

practice of proceedings *in rem*. The Advisory Committee's Note of 1966, discussing Rule C, states:

> This rule is designed not only to preserve the proceeding in rem as it now exists in admiralty cases, but to preserve the substance of [the earlier] Admiralty Rules 13–18. The general reference to enforcement of any maritime lien is believed to state the existing law . . .

The 1920 rules were simply determined to be too specific, where generality was needed, and therein lies the major reason for the 1966 revision.

9. Specifically, we do not intimate any opinion concerning the validity of an arrest (seizure) under writ of foreign attachment to obtain jurisdiction over a non-resident defendant in an *in personam* suit.

held within a short period after arrest if requested.[10] If no response is given to the seizure within 10 days, the lienor must give notice to the world under Rule C(4).

Rule E(8) permits a claimant to appear for the restricted purpose of testing the arrest without submitting to the general jurisdiction of the court. Upon posting of a bond, the property will be promptly released under Rule E(5), and the security may be reduced upon motion to the court under Rule E(6). Rule E(2)(b) gives the court power to require security for costs and expenses to be posted by the party initiating the *in rem* seizure to protect parties affected by the seizure. Finally, under Rule E(4), the actual arrest and custody of the property is handled by a United States Marshal.

The claimants argue that the Admiralty rules are constitutionally deficient because they do not provide for the participation in the seizure by a judge or magistrate. The argument for notice and a hearing before seizure, however, falters at two crucial points. First, the inherent risks of deterioration, attachment of additional liens, destruction, alienation, and conveyance to third parties which are present in the maritime context require that a vessel be subject to immediate seizure to be held in custody to protect and enforce a valid maritime lien. Seizure of a vessel pursuant to a valid lien has been necessary for centuries due to the wandering nature of a ship in commerce. Second, it is questionable whether a judge or magistrate on a pre-arrest basis could fairly consider complicated transactions bearing on the ultimate enforcement of the asserted maritime lien. A denial of the seizure might effectively dispose of the claim on the merits without trial. The *lienor* would then be denied due process under the Fifth Amendment.

Beginning, then, with the Admiralty rules themselves, we find it clear that the seizure provisions preserve both the rights of the respective parties and the necessities of maritime commerce.

### Procedural Safeguards Under Local Rule 21

The claimants further argue that the Admiralty rules do not guarantee a prompt post-seizure hearing and thus provide no opportunity to strike down an improper attachment. Local Admiralty Rule 21, in the United States District Court for the Western District of Louisiana, provides a procedure to protect claimants:

> Whenever there is an arrest *in rem* or whenever property is attached, the party arrested or any person having a right to intervene in respect of the thing attached, may, upon evidence showing any improper practice or a manifest want of equity on the part of the libellant, be entitled to an order requiring the libellant to show cause instanter why the arrest or attachment should not be vacated.

The claimants before us simply have no basis for objecting to the constitutionality of the seizures on the ground that they were not granted a prompt post-seizure hearing. Indeed, in *Maryland Shipbuilding & Dry-Dock Co. v. Pacific Ruler Corporation*, 201 F.Supp. 858 (S.D.N.Y.1962), a claimant was able to use a local rule similar to Rule 21 to strike down an improper attachment.

And for districts which may not have formally prescribed to the equivalent of W.D.La.Rule 21, we have no doubt that every Admiralty Court has the inherent power to assure the protections contemplated.

### Preferred Ship Mortgages

The Ship Mortgage Act of 1920, 46 U.S.C. §§ 911 *et seq.*, gives a preferred status to a valid mortgage held by a U.S. citizen on certain statutorily defined vessels. The mortgage must be recorded, and upon default of any term or condition of the mortgage, the lien is to be enforced by an admi-

---

**10.** The court in *Amstar Corp. v. M/V Alexandros T.*, 431 F.Supp. 328, 335 & n. 7 (D.Md.1977), stated that it would have immediately granted a post-seizure hearing to claimants had they asked for it.

ralty action *in rem.* 46 U.S.C. § 951. Indeed, as we held in *J. Ray McDermott & Co. v. Vessel MORNING STAR*, 457 F.2d 815, 818 (5th Cir. 1972), the Act applies exclusively and overrides state procedures, practices and consequences. In addition to notice by publication, actual notice of the commencement of a suit *in rem* must be given by the lienor in such manner as the court shall direct to the master of the vessel and to those who have recorded a notice of claim. 46 U.S.C. § 951.

In the present controversy, eight vessels were seized on July 18, 1979, following the filing of eight separate actions *in rem.* Claims by the vessel owners were filed on the vessels during the first two weeks of August, 1979. It is undisputed that the lienors in the present action sought foreclosure of preferred ship mortgages, and all of the statutory requirements were properly carried out pursuant to congressional policies to protect lienors and claimants alike. Since the preferred ship mortgage Act expressly contemplated enforcement through a libel *in rem* with seizure of the vessels under admiralty process, the seizure of the vessels could have come as no surprise to claimants.[11] By the mortgages executed and filed, claimants knew that on non-payment of the debts secured, foreclosure in the admiralty would take place.

### The Unique Character and Context of the Maritime Lien

The problems associated with enforcement of a maritime lien by the seizure of a vessel bear little or no resemblance to the garnishment of wages[12] or the replevin of a

consumer's stove.[13] The present controversy involves the constitutionality of *in rem* arrest only. Under traditional admiralty law, maritime property is subject to arrest in order to enforce a maritime lien. The maritime lien has at its basis, to a substantial extent, the historical and theoretical concept of personification: a vessel is liable, as such, for torts and contracts even though the owner may or may not be. Contrary to the District Court's opinion in *Karl Senner v. M/V ACADIAN VALOR*, 485 F.Supp. 287 (E.D.La.), 1980 A.M.C. 1, the doctrine that the vessel itself has a liability, albeit articulated occasionally in part as a legal fiction, is fundamental in the context of arrest of vessels. It is no fiction that the law recognizes that a maritime lienor has an *interest* in the vessel. That is a legal fact.

What we are doing here is in no sense in conflict with this Court's recent decision in *Baker v. Raymond International, Inc.*, 656 F.2d 173 (5th Cir. 1981), in which the personification concept was critically discussed ("The personification theory did not, however, weather all legal storms.... '[T]he fiction of ship's personality,' according to professors Gilmore and Black, 'has never been much more than a literary theme,' now fallen into disrepute"). Our concern in the present action is not to argue the utility or necessity of legal fictions. It suffices that, for purposes of a maritime lien, the lien creates an interest in the vessel, and the vessel itself, as an entity apart from its owner, may be seized and held liable to enforce the lien. Whether a vessel is liable

---

**11.** 46 U.S.C. § 951:

> A preferred mortgage shall constitute a lien upon the mortgaged vessel in the amount of the outstanding mortgage indebtedness secured by such vessel. Upon the default of any term or condition of the mortgage, such lien may be enforced by the mortgagee by suit *in rem* in admiralty.... In addition to any notice by publication, actual notice of the commencement of any such suit shall be given by the libellant, in such manner as the court shall direct, to (1) the master, other ranking officer, or caretaker of the vessel, and (2) any person who has recorded a notice of claim of an undischarged lien upon the

> vessel ... unless after search by the libellant satisfactory to the court, such mortgagor, master, other ranking officer, caretaker, or claimant is not found within the United States. Failure to give notice to any such person ... shall not constitute a jurisdictional defect; but the libellant shall be liable to such person for damages in the amount of his interest in the vessel terminated by the suit.

**12.** *See Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).

**13.** *See Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

itself for other types of claims, we need not address.

■ Of course, the doctrine of the ship's own liability and the lienor's enforceable interest in the vessel are subject to the proper constraint of the due process clause of the Fifth Amendment. However, as the Supreme Court observed in *Mitchell v. W. T. Grant Co.*,

> [the] requirements of due process of law "are not technical, nor is any particular form of procedure necessary." Due process of law guarantees "no particular form of procedure; it protects substantial rights." "The very nature of due process negates any concept of inflexible procedures universally applicable to any imaginable situation." (citations omitted)

416 U.S. at 610, 94 S.Ct. at 1901, 40 L.Ed.2d at 415 (1974). The Constitution is sufficiently flexible for this Court to consider fundamental fairness in the situation in which it is invoked. Moreover, federal courts have inherent powers in admiralty. *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 409, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251, 261, 1975 A.M.C. 541, 550. An Admiralty Court thus possesses a particular and sufficient capacity to enter whatever order would be appropriate with respect to the release of a vessel under seizure or the posting of security on the part of the initiating suitor.

A maritime lien gives to its holder a property right in a vessel, and the proceeding *in rem* is simply a means of enforcing the property right. Whether the maritime lien arises by operation of law from a tort, from the supplying of goods, services and necessaries to a vessel, or from a preferred ship mortgage like those in the present controversy, the maritime lienor has an interest in the vessel herself, and the arrest of the vessel is to enforce that interest, the maritime lien. The action is to enforce a property right in the vessel.

Arrest in admiralty *in rem* regards the vessel as the interest concerned, and the seizure *in rem* of a vessel accomplished under Rule C brings notice of the action to all persons having an interest in the vessel. The owner of a vessel, as claimant, is clearly an interested person having the right to due process of law before his property is sold. The Admiralty takes care of this right by expressly allowing the owner (or its representative such as the shipmaster) to file a claim and answer.[14] The owner, however, is not a necessary party to the action *in rem*.[15]

14. Rule C(6):
*Claim and Answer* .... The claimant of property that is subject of an action *in rem* shall file his claim within 10 days after process has been executed, or within such additional time as may be allowed by the court, and shall serve his answer within 20 days after the filing of the claim. The claim shall ... state the interest in the property by virtue of which the claimant demands its restitution and the right to defend the action. If the claim is made on behalf of the person entitled to possession by an agent, bailee, or attorney, it shall state that he is duly authorized to make the claim....
Rule C(4):
*Notice.* No notice other than the execution of the process is required when the property that is the subject of the action has been released in accordance with Rule E(5) [release by special bond, general bond, consent, or stipulation]. If the property is not released within 10 days after execution of process, the plaintiff shall promptly or within such time as may be allowed by the court cause public notice of the action and arrest to be given in a newspaper of general circulation in the district, designated by order of the court. Such notice shall specify the time within which the answer is required to be filed as provided by subdivision (6) of this rule. This rule does not affect the requirements of notice in actions to foreclose a preferred ship mortgage pursuant to the [Ship Mortgage Act of 1920].

15. *See* p. 20 of *Amicus* Brief of the Maritime Law Association of the United States filed in *Karl Senner v. M/V ACADIAN VALOR, supra,* which discusses this uncontradicted historical development:
[In the 1920 Ship Mortgage Act,] Congress abolished the "home port doctrine" [No *in rem* rights to creditors in vessel's home port who knew of owner's presence for personal jurisdiction] and affirmed the traditional right of a maritime lienor to an action *in rem* without regard to the location of the vessel or her owners....
The law of the United States has thus been uniform, at least since 1910 until now, that those providing services to vessels are enti-

## Some Practical Illustrations

In order to demonstrate the necessity and practicality of the historical maritime *in rem* seizure provisions, it is helpful to discuss certain common situations requiring immediate seizure of a vessel.

Collision cases furnish a typical example of the need and practicality for a maritime lien. As early as 1844, it was "not an uncommon course in the admiralty . . . to treat the vessel in which or by which, or by the master or crew thereof, a wrong or offense has been done as the offender without any regard whatsoever to the personal misconduct or responsibility of the owner thereof." *The Brig Malek Adhel*, 43 U.S. (2 How.) 210, 233, 11 L.Ed. 239, 249 (1844). Wrongful collision creates a lien in the offending vessel, Gilmore & Black, *The Law of Admiralty* § 7–6 (2d Ed. 1975), such that a proceeding *in rem* may be brought against the vessel.

Another common source of the maritime lien is found in the Federal Maritime Lien Act, 46 U.S.C. § 971, which provides that "any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by a suit in rem . . . ." Again, the maritime lien is enforceable by seizure in admiralty.

In the above two situations, and also where a maritime lien is created by a preferred ship mortgage, a paramount consideration is the highly mobile character of contemporary maritime commerce. With vessels able to limit their time in port to less than 24 hours, tremendous risks confront those who are involved in a collision with a vessel that is still navigable, those who render goods and services to a vessel, and those who extend credit to a vessel.

Maritime property frequently moves beyond the reach of this Nation's jurisdiction, and the owners of such property often have no contact with the United States other than their vessels' brief stops in our ports. For centuries, the solution to the difficulties experienced by tort victims, those who extend commercial services, and those who extend credit has been the maritime lien.

Because the lienor has an interest in the vessel, his rights are limited to the value of the vessel and dependent upon the vessel's continued existence in the port. And because the right vanishes with the vessel, a swift and sure process must be available to secure the vessel, the sole defendant in the action. The question must be asked: what is a lienor to do when the vessel that has caused the collision, or accepted services, or is subject to a preferred ship mortgage, is scheduled to leave at midnight on Saturday night? How is the vessel to be detained? It is not at all hypothetical to say that such a vessel will indeed leave the jurisdiction. A lienor who chooses to follow the vessel faces the inevitable difficulties of foreign laws, with often unpredictable burdens of proof and defenses.[16] The lien might be lost altogether and the lienor has no certainty that the vessel will return to a United States port. Even if the vessel does return, months or years later, other liens may well have attached.

The Federal Courts have a great responsibility to speak consistently in maritime controversies because of their recognized national and international significance. They must take care not to fashion rules and exceptions for particular circumstances without assessing their impact in other situations. The rules and procedures in the maritime environment must apply equally to gigantic ocean-going oil tankers traveling from the Middle East to Japan and to small inland barges. Although the inland barge is not likely to leave the jurisdiction

tled to proceed *in rem* against the vessel herself, regardless of whether the owner is present or not. . . .

16.   *See generally M/S BREMEN v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513, *vacating In re Unterweiser Reederei, GmBH*, 428 F.2d 888 (5th Cir. 1970), *adopted* 446 F.2d 907 (1971) (en banc).

overnight, many of the other risks that the lienor of a large ocean-going vessel faces are nevertheless present, including the risk of damage to the vessel during movement, the attachment of other liens, conveyance to third parties and deterioration as in the present controversy.

In many cases, where a vessel is seized pursuant to a maritime lien, the claimant(s) will be able to raise defenses to the lien. If requested, a hearing will be held in which the claimant(s) may appear without submitting to the general jurisdiction of the court. If security is posted, or if the seizure is shown to have been improper, the vessel may be released. Yet if vessels cannot be held pending a judicial determination of the validity of the lien, if the clerk cannot issue and the marshal not execute a warrant for the arrest of the vessel, then the maritime lien, whether originating in a collision, provision of services, or a preferred ship mortgage, would lose its century-old significance in the admiralty. The fugacious nature of most vessels, together with the need for certainty and uniformity in the maritime environment, compels this Court to reaffirm, for very practical and up-to-date reasons, the historically-rooted procedure of *in rem* seizure to enforce a maritime lien.

### Constitutional Challenges

In 1976, the United States District Court in Mississippi was faced with the contention that Rules C and E, see note 1 *supra*, violate the Due Process Clause of the Fifth Amendment on their face and as applied because they make possible the arrest or seizure of property without notice or opportunity for hearing prior to dispossession. *Central Soya Co., Inc. v. Cox Towing Corp.*, 417 F.Supp. 658, 661 (N.D.Miss.1976), 1980 A.M.C. 459, 463. Judge Orma R. Smith, now sitting as a member of this panel by designation, reviewed in *Central Soya* recent Supreme Court decisions, and formulated the general rule that due process of law under the Fifth Amendment requires notice or opportunity for an early hearing and the participation of a judicial officer whenever a property owner is to be deprived of the use of his property during the pendency of litigation in which the owner is involved. 417 F.Supp. at 662, 1980 A.M.C. at 464. This rule, however, is subject to an "extraordinary situations" exception, first noted by the Court in *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), and discussed at length in *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). In *Fuentes*, the Supreme Court observed that in only

> a few limited situations has this Court allowed outright seizure without opportunity for a prior hearing. First, in each case the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.

*Fuentes v. Shevin*, 407 U.S. at 90–91, 92 S.Ct. at 1999, 32 L.Ed.2d at 576 (footnotes omitted). The District Court in *Central Soya* reasoned that an "extraordinary situation" exists where seizure is necessary in order to vest the Court with jurisdiction, more particularly, where a Court must seize and arrest a vessel in order to acquire *in rem* jurisdiction to permit a plaintiff to enforce its maritime lien against the vessel, and concluded that an *in rem* seizure and arrest of a vessel pursuant to Rules C and E falls within the "extraordinary situations" exception to the general rule prohibiting pre-hearing seizure. 417 F.Supp. at 663, 664, 1980 A.M.C. at 464, 465.

Similar reasoning is found in *A/S Hjalmar Bjorges Rederi v. The Tug Boat CONDOR*, 1979 A.M.C. 1696 (S.D.Cal.1979), where the court was again faced with the challenge that the *in rem* admiralty arrest procedures upon which jurisdiction was predicated did not afford due process of law. *Id.* at 1701. It found "exceptional circumstances" to exist because the seizure

was necessary to secure admiralty jurisdiction.

Because of the mobile and international character of shipping, arrest of a vessel may often be the only feasible method of acquiring jurisdiction, and thus providing a forum for maritime claims. The procedure serves an important governmental and public interest. Similarly, the need for prompt action is recognized as peculiar to admiralty and a necessary part of the proceedings.

*Id.* at 1702.

The claimants in the present controversy point out that there is a split of authority between the various District Courts, and that, to date, no Circuit Court of Appeals has addressed the issue of the constitutionality of Rules C and E. They point to *Karl Senner, Inc. v. M/V ACADIAN VALOR,* 485 F.Supp. 287, 287, 1980 A.M.C. 1, 2 (E.D. La.1980) (where *in personam* jurisdiction exists, Rule C is unconstitutional). That court distinguished *Lee Stoner v. O/S NEISKA II,* 1978 A.M.C. 2650 (D.C.Alaska 1978), because the *Stoner* Court, in upholding Rule C, relied in part on a local rule providing for an expeditious post-seizure hearing. 485 F.Supp. at 294 n.14, 1980 A.M.C. at 13 n.14.

As discussed earlier, Local Admiralty Rule 21 provides that a party "may, upon evidence showing any improper practice or a manifest want of equity on the part of the libellant be entitled to an order requiring libellant to show cause instanter why the arrest or attachment should not be vacated." The claimants argue that this rule does not offer the type of hearing that might otherwise cure the pre-seizure hearing deficiencies of Rules C and E. Rule 21, they argue, fails specifically to provide a hearing at which the lienors would have the initial burden of showing a probability of

success on the merits of their claims and a factual need for prompt action. We disagree. As we will be discussing in the next section, it is both impractical and unnecessary to insert a judicial hearing between the complaint and the seizure.

*Does an Ordinary Maritime Seizure Constitute an "Extraordinary Situation"?*

■ The Supreme Court has held that in certain "extraordinary situations," seizures without notice or opportunity to be heard would still be valid. The necessary factors, briefly, to constitute an "extraordinary situation" include an important governmental or general public interest, the necessity for prompt action, and state control by a governmental agent who initiates the seizure. *Fuentes,* 407 U.S. at 91, 92 S.Ct. at 2000; *Mitchell,* 416 U.S. at 604–09, 94 S.Ct. at 1898–1901. The *Fuentes* Court, citing *Ownbey v. Morgan,* 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921), gave as an example of an important public interest the seizure of property necessary to secure jurisdiction. 407 U.S. at 91 n.23, 92 S.Ct. at 1999 n.23. All conflicts between that line of cases and the admiralty rules could be resolved simply by declaring that in all *in rem* actions, seizure of the *res* is necessary for jurisdiction to attach.

■ The brief of the *amicus curiae* (Maritime Law Association of the United States),[17] submitted to this Court in support of the constitutionality of Rule C, presents a different perspective. In their view, the *Fuentes* criteria for "extraordinary circumstances" are simply inapplicable to the admiralty situation. The correct foundation, *amicus* submits, for finding Rule C constitutional is the distinct character of the admiralty action *in rem.* Because arrest in admiralty *in rem* regards the vessel as the party liable, the verified complaint filed by

**17.** The Maritime Law Association of United States is an unincorporated association of lawyers concerned with the administration and reform of admiralty law, and regularly participates in national and international proceedings concerning maritime treaties and conventions. Its membership includes lawyers representing shipowners, cargo-shippers, personal injury

and death claimants, and underwriters. Their interest in the present controversy is based upon both the need for certainty in international commercial transactions for all parties involved, and the growing risk that fundamental principles of maritime law are presently being inadvertently eroded.

a maritime lienor as well as the prayer for seizure constitute the "process" that brings that entity into court. Together, the verified complaint and the warrant constitute "notice", and the shipmaster (or person in charge) knows of the arrest and is in a position to notify the owner. There is no more need to insert a judicial hearing between the complaint and the seizure under the warrant than there would be for a judicial hearing between filing of a complaint and service of the summons upon a defendant in an action *in personam*. Notably, under this position, jurisdiction is asserted on the basis of the presence of the vessel within the district.[18]

Because of the historical uniformity and the unique character of the admiralty *in rem* procedures, it is not necessary for Rule C to meet the "extraordinary circumstances" test in *Fuentes*. Like the District Court in *Bethlehem Steel Corp. v. The VALIANT KING*, 1977 A.M.C. 1719 (E.D.Pa.), we "start with the proposition that a maritime lien is peculiar to the law of admiralty . . . ." *Id.* at 1722. As stated by the District Court in *Amstar Corp. v. M/V ALEXANDROS T*, 431 F.Supp. 328, 332–33 (D.Md.1977), 1977 A.M.C. 537, 543:

> It has long been recognized that admiralty procedures for the attachment or arrest of a foreign vessel are a useful and necessary part of the admiralty law . . . . Vessels are highly mobile, and the practicalities of maritime commerce require that a ship unload its cargo in a particular port and be on its way as soon as possible. (citations omitted)

Granted, admiralty law cannot, on the basis of historical tradition, escape the due process clause of the Fifth Amendment. But Rule C and the power of the Admiralty to afford early post-seizure relief supplies the process that is due.

### Maritime Lien Distinguished

We emphasize again that the present opinion addresses only admiralty proceedings *in rem*, and in no way concerns the *in personam* or *quasi-in-rem* proceedings that also arise in admiralty, particularly the attachment and garnishment procedures of Rule B. A maritime lien represents a property interest entirely distinct from an *in personam* right. "An action in admiralty to enforce a maritime lien is not an action against any particular person to compel him to do or to forebear anything; it is an action *in rem* asserting against the world the claim of a plaintiff to an offending ship. It is a real action to enforce a real right." *E. Biele, Maritime Liens Arising out of Collision*, 51 Tulane L.Rev. 1134, 1134 (1977) (footnote omitted).

### Conclusion

Rule C, as we have shown, is uniquely suited to the admiralty context. It provides that maritime lienors must file a verified complaint that describes the property and states that the property is within the

18. Rule E(3)(a) states that process *in rem* "shall be served only within the district." In *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), the Supreme Court held that, in a nonmaritime action, assertion of *in rem* or *quasi in rem* jurisdiction, as well as personal jurisdiction, requires that a defendant have certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. Under the strict personification theory of admiralty *in rem* actions, jurisdiction is asserted over the vessel under the same circumstances that jurisdiction could be asserted over an individual. *Shaffer* thus results in no change in the admiralty context. *See* A. Bohmann, *Applicability of Shaffer to Admiralty In Rem Jurisdiction*, 53 Tulane L.Rev. 135, 143 (1978).

The need for the "presence" of the defendant to support jurisdiction is neither relevant nor at issue in the present controversy. However, this brief discussion highlights yet another unique aspect of admiralty law. That is, a foreign ship may be sued even though it would not satisfy the "minimum contacts" tests developed out of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The theory of the ship's own liability is sufficient to confer *in rem* jurisdiction without regard to the contacts its owner may have with the district. It is clear that the due process questions in admiralty are significantly different than in attachment proceedings commenced in state courts.

district or will be within the district during the pendency of the action. Upon the filing of the complaint, a warrant for the arrest of the vessel is issued and delivered to the marshal for service. To the extent that a ship owner must be notified of an action *in rem* in admiralty, Rule C is well calculated to bring notice of the action to all persons having an interest in the vessel. Local Rule 21 and the inherent power of the admiralty guarantee to a vessel-owner a prompt post-seizure hearing at which he can attack the verified complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings up to that point. Moreover, the admiralty court has equitable powers to enter whatever orders would be appropriate with respect to the discharge of a vessel under seizure or the posting of security on the part of the plaintiff. We uphold without any hesitation the constitutionality of the rule.

AFFIRMED.

TATE, Circuit Judge, dissenting:

I respectfully dissent. In my opinion the prejudgment seizure of a vessel, authorized by Rule C, based solely upon ex parte conclusory allegations and automatically issued by the clerk without judicial scrutiny or authorization, offends the due process requirements for prejudgment seizure enunciated over the past decade by decisions of the United States Supreme Court.[1]

The majority's scholarly and forceful opinion has set forth compelling reasons why, in the maritime context, a prejudgment seizure need not be preceded by a hearing or by prior notice to the vessel or its owner.[2] The reasons advanced do not, however, compel the conclusion that the same protection to maritime interests might not likewise be accorded by procedures that meet minimum due process requirements, enunciated by the Supreme Court as to all other prejudgment seizures. For instance, the prejudgment seizure should be based upon a more detailed showing both as to the prima facie validity of the maritime lien and also of reasonable cause for the issuance of the writ (which showing could be made by affidavits indicating reliable hearsay testimony); the seizure should issue, not automatically upon filing by an interested party, but only after a judicial officer has had the opportunity to scrutinize the showing in order to ascertain that it establishes a prima facie case for the seizure; and the seizure should be made only after judicial authorization.[3]

In a series of decisions over the past decade, the Supreme Court has enunciated the due process criteria that govern the validity of a prejudgment seizure of property of a debtor. Except in limited situations, prior notice and a post-seizure hearing is required; in the event that pre-seizure hearing is not required, the seizure must be authorized by a judicial officer, and it must be based upon an affidavit or showing going beyond conclusory allegations and clear-

1. In the main, my conclusions as to the unconstitutionality of Rule C are similar to those reached by the able district court in *Karl Senner, Inc. v. M/V Acadian Valor*, 485 F.Supp. 287 (E.D.La.1980) and to the excellent Note, 55 Tul.L.Rev. 936 (1981), analyzing that opinion and the applicable jurisprudence. I am indebted to the analyses therein. With regard to the maritime action commenced by a prejudgment seizure *in rem*, the Note summarizes (footnotes omitted): "A maritime action *in rem*, however, is virtually unknown outside admiralty jurisdiction and is one of the most drastic remedies known to modern law: process may issue without a court order and the defendant need not be personally served. Further, the plaintiff is not required to post bond to protect the defendant against a mistaken seizure, whereas the defendant may be required to post bond for twice

the amount of the claim in order to have the seized property released." 55 Tul.L.Rev. at 938.

2. Nor do I quarrel with the majority's conclusion that, in the maritime context, the seizure of the vessel itself may sufficiently give notice to those affected, through the master and by knowledge of the shipping agents, as to be sufficient for purposes of affording the prompt post-seizure hearing that the majority recognizes is constitutionally required.

3. The opinion in *Karl Senner, Inc., supra*, 481 F.Supp. at 295 and n.15, notes that Rule C would probably pass constitutional muster with these requirements (assuming of course that prompt post-seizure hearing is available).

ly setting out the facts entitling the creditor to sequestration, and the procedure must then entitle the debtor to a prompt post-seizure hearing to obtain the release of his property if the seizure is unwarranted. *See, North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Finance Corp. of Bay View*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).

The jurisprudence has recognized, however, that in limited circumstances ("extraordinary situations") immediate seizure of property interest may be constitutionally permissible. In *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 676, 94 S.Ct. 2080, 2089, 40 L.Ed.2d 452—which upheld such a prejudgment seizure—the Court reiterated that these extraordinary circumstances are those in which

" 'the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.' " .

In that case, the prejudgment seizure was upheld because pre-seizure notice and hearing might frustrate the interest served by the statute, but also because the purpose of the seizure fostered "the public interest in preventing continued illicit use of the property" and because the "seizure is not initiated by self-interested private parties rather

Commonwealth officers determine whether the seizure is appropriate under the provisions of the Puerto Rican statutes." *Id.*, 416 U.S. at 679, 94 S.Ct. at 2090.

It is apparent to me that, if indeed these decisions govern admiralty actions, Rule C does not meet the due process requirements of prejudgment seizure there set forth. The interest of a private creditor, not of the public, is served by the seizure, which itself may be perfunctorily granted by a district court clerk upon conclusory affidavit by an interested creditor.[4] (Since we are considering the facial unconstitutionality of the Rule, my discussion primarily concerns the prejudgment seizure to enforce a maritime lien in general as did the majority. I will not discuss the specific instance of a preferred ship mortgage, which may afford more particularized showing, but which equally does not require judicial scrutiny and authorization.)

The majority seems to come close to conceding that, if the *North Georgia-Mitchell-Calero-Fuentes* decisions apply to admiralty prejudgment *in rem* procedures, then the Rule C prejudgment seizure (upon conclusory allegations of a creditor and without prior judicial authorization) does not meet all of the criteria for the "extraordinary situation" exception to the due process requirements imposed by those decisions. Rather, if I understand the majority, it feels that admiralty *in rem* jurisdiction raises considerations generically different from the ancient civil prejudgment remedies held to be unconstitutional by the decisional criteria set forth in those cases. To caricature the majority's holding, it feels that because Admiralty is Different, the due process requirements of our Constitution as enunciated by the Supreme Court should not apply to the ancient practices peculiar to this arcane and specialized field.

---

**4.** Compare, for instance, the Supreme Court's characterization in *North Georgia Finishing, Inc., supra*, 419 U.S. at 607, 95 S.Ct. at 722, of *Mitchell v. W. T. Grant Co., supra*, the only decision in the recent decade permitting prejudgment seizure by a private creditor without prior notice and hearing: "The writ, however, was issuable only by a judge upon the filing of an affidavit going beyond mere conclusory allegations and clearly setting out the facts entitling the creditor to sequestration. The Louisiana law also expressly entitled the debtor to an immediate hearing after seizure and to dissolution of the writ absent proof by the creditor of the grounds on which the writ was issued."

I find no warrant in the decisions cited to believe that the due process required by the Fifth Amendment in federal proceedings is any less than that imposed upon state procedures by the similar due process requirements of the Fourteenth Amendment. While the peculiar needs of admiralty do indeed justify dispensing with prejudgment notice and hearing, I can find no reason to believe that its peculiar needs, any more than in the state creditor remedies held to be unconstitutional, dispense with prior factual showing of the validity of the creditor's claim and with judicial authorization for such prejudgment seizure. As we stated in *Johnson v. American Credit Co. of Georgia,* 581 F.2d 526 at 534 (5th Cir. 1978), after summarizing the Supreme Court's decisions: "It seems clear, then, that due process requires that a prejudgment seizure be authorized by a judge who has discretion to deny issuance of the appropriate writ."

The relatively recent decision in *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), it seems to me, brings into substantial question some of the predicates upon which the majority bases its conclusion that Rule C passes constitutional due process muster. *Shaffer,* it is true, concerned a different issue than that before us: the due process validity of the quasi *in rem* attachment by a creditor of a non-resident's property. Nevertheless, as the latest expression by the Court on due process considerations equally present in an admiralty *in rem* prejudgment seizure, its rationale and holdings are not without application to the present issue. See, e. g., Bohmann, Applicability of *Shaffer* to Admiralty *in rem* Jurisdiction, 53 Tul.L.Rev. 135 (1978).

For instance, insofar as the majority relies upon the *in rem* interest in the property created by a maritime lien, or the ship-personification theory, as somehow substantially lessening minimal due process requirements, *Shaffer* pointed out, 433 U.S. at 207, 97 S.Ct. at 2581: "The case for applying to jurisdiction *in rem* the same test of 'fair play and substantial justice' as governs assertions of jurisdiction *in personam* is simple and straightforward. It is premised on recognition that '[t]he phrase, "judicial jurisdiction over a thing", is a customary elliptical way of referring to jurisdiction over the interests of persons in a thing.' "

Again, insofar as the majority implies that the ancient admiralty procedures should thereby somehow be immune from the due process requirements enunciated by *Fuentes* et al., *Shaffer* comments, 433 U.S. at 412, 97 S.Ct. at 2584: " '[traditional] notions of fair play and substantial justice' can be as readily offended by the perpetuation of ancient forms that are no longer justified as by the adoption of new procedures that are inconsistent with the basic values of our constitutional heritage."

In summary, the majority opinion is a forceful and appealing statement of the reasons why due process requirements ordinarily applicable to prejudgment seizure by other creditors are not applicable to an admiralty *in rem* seizure, because Admiralty is Ancient and Admiralty is Different. Due process requirements are admittedly flexible and depend upon varying circumstances; perhaps, indeed, the majority's conclusions will find favor with the Supreme Court. Nevertheless, since the Court has spoken so forcefully and clearly as to the minimum due process requirements applicable to a creditor's prejudgment seizure—which Rule C does not meet—, I am unable in the face of the Court's clear holdings and expressions over the past decade to agree that admiralty's Rule C should be exempt from the due process requirements applicable to all other prejudgment seizures by all other creditors. In the cited decisions, the Court rejected what seemed to me to be equally forceful pragmatic arguments by creditors as to the necessity for judicially unsupervised prejudgment seizures. I can see no logical or pragmatic reason, nor any based upon the Court's decisions in the area, why a uniform standard of procedural due process should not apply to all private litigants, whether in admiralty or otherwise.

Accordingly, I respectfully dissent.