MacDOUGALLS' CAPE COD MARINE SERVICE, INC., Plaintiff, Appellant,

v.

ONE CHRISTINA 40' VESSEL, etc., Defendant, Appellee.

No. 89–1884.

United States Court of Appeals, First Circuit.

March 30, 1990.

Leonard Rose, Falmouth, Mass., for plaintiff, appellant.

Brian P. Flanagan, Boston, Mass., for defendant, appellee.

Before BREYER, ALDRICH and CYR, Circuit Judges.

BAILEY ALDRICH, Circuit Judge.

The ultimate question in this case is whether we should affirm the district court's undoing of a seemingly fast piece of work performed by plaintiff-appellant MacDougalls' Cape Cod Marine Service, Inc., on the admiralty side of the district court. Stuart Fultz, appellee, would-be claimant, whose regular employment was in the food business, sold yachts as a side endeavor, and rented an office in plaintiff's boat yard. In the summer of 1987 he purchased, with the view of ultimate resale, a partially completed sail yacht of the Hans Christina class, hereinafter the vessel. The hull, with engine installed, was delivered, in late July, by truck, along with masts, furnishings, and other equipment, to the yard, and plaintiff contracted to complete the construction. After full commissioning, the October 1987 drop in the stock market had so softened the demand for yachts that Fultz was unable to sell the vessel, although she had been taken to Newport, Rhode Island, and Stamford, Connecticut boat shows for exhibition. Fultz failed to pay his bills—from the start—to the yard, and when he wanted to take the vessel to the Boston show in January, 1988, plaintiff's manager, Dayton, told him the bills were a lien on the vessel, and she could not be-moved. Dayton also told him that he was cancelling his office space, and to remove his equipment.

Fultz raised a question about some of the charges, but he did nothing about payment. Parenthetically, this could not have been of vital concern to plaintiff, as it was amply secured by the vessel, and it was charging 18% interest. Nor did Fultz remove his office equipment. Plaintiff mailed him bills monthly, the last one dated August 26, 1988. Finally, in November, 1988 Fultz came to the yard to take his equipment, and noticed that the vessel had been transferred indoors from outer storage. According to plaintiff's witness, at the hearing on Fultz's motion, post, there was posted upon her a marshal's notification of seizure, and Fultz saw it.

There had, in fact, been a seizure. On March 28, 1988, plaintiff filed a verified complaint in rem in the district court, "for necessaries," together with a motion for warrant of arrest to issue against defendant vessel. The motion was allowed, and the vessel arrested on March 31. The complaint alleged that pursuant to 46 U.S.C. § 971, now amended and codified at 46 U.S.C. § 31342, there was "a maritime lien against the defendant Vessel to the extent of the unpaid balances which are now owed, in the amount of $31,208.01 plus interest at 18% per annum percent from September 1987." The complaint was verified by Dayton on behalf of plaintiff, and the motion, adopting this same statement with respect to the maritime nature of the lien, was verified by present counsel.

Publication of the arrest was made on April 23 in a newspaper of general circulation, and on May 24 a default judgment was entered against the vessel. This last was in response to a motion, verified by counsel, stating, "The cause of action is maritime, for a sum certain as set forth in

plaintiff's complaint." On July 22, following a newspaper advertisement on July 14 and July 21, a public auction was held, with plaintiff the only bidder. Plaintiff bid $10, and on July 27 filed a stipulation that its default judgment, in the amount of $34,-484.85, plus costs, would be deemed fully satisfied if the marshal's sale were confirmed. The vessel had been appraised at "over $105,000."[1] On August 5 the court confirmed the sale. Plaintiff later sold the vessel to a party out of state.

Other than publication, no notice of the in rem proceeding was given to Fultz, although plaintiff well knew his local mailing address. Dayton did testify that he gave Fultz telephone notice, but the court, quite reasonably, disbelieved this.[2] According to Fultz, he first learned of the in rem proceedings in January, 1989 when, in response to current advertisements he had placed in the Boston Globe, he received a favorable inquiry from New Hampshire. Fultz then telephoned Dayton to arrange to show the vessel, and was told that it had been sold and was in New Jersey. Fultz thereupon consulted counsel, and on March 3, 1989 filed a motion to be relieved from judgment pursuant to Fed.R.Civ.P. 60(b)(6), and for leave to file a claim and answer, together with a supporting affidavit. Accompanying the motion was a memorandum asserting further grounds for relief.

Fultz's motion was addressed to the single point that the sale had violated his rights to due process under the Fifth Amendment, adding that he had never received notice of the arrest or of the default judgment. The motion, however, incorporated the memorandum, and the memorandum raised a claimed-to-be jurisdictional point, that much of the charges related to completing the construction and commissioning the vessel, and did not give rise to a maritime lien. The memorandum stated that $22,108.29 of the amount claimed was for commissioning, and that something less than $5,000 was attributable to services rendered in November for dismantling and hauling the vessel, and winter storage.

The court conducted a hearing at which Dayton testified that the amount owed on the vessel "was in the area of $28,000."

Q. What work or services comprised that $28,000?

A. It was really the assembly of the boat from the factory and commissioning of the boat.

Following the hearing, the court wrote an extensive opinion, 721 F.Supp. 374, but did not reach the due process claim. Instead, it found that plaintiff had failed to establish admiralty subject-matter jurisdiction. "[T]he majority of the costs claimed by plaintiff [are clearly nonmaritime, and] relate to services rendered in commissioning the vessel, ... plaintiff has not shown that any potential maritime element is subject to separate adjudication." Though finding Fultz saw the marshal's notice of seizure posted on the vessel in November, 1988 when he came to recover his office equipment, the court found that the March 3, 1989 motion to vacate was within a reasonable time, and allowed it.[3]

A footnote attached to the reasonable time finding is instructive, and we will begin there.

This Court is unpersuaded by plaintiff's prejudice argument. Plaintiff should have been more forthright with the Court from the time the Complaint was filed as to the nature of the services for which plaintiff sought compensation. Indeed, the Court is troubled that the jurisdictional issue has largely been dodged by plaintiff from the very start. The original construction doctrine is firmly entrenched in the case law and cannot be

---

1. Strictly, plaintiff filed a statement to the effect that the vessel was new, and that a recognized service quoted $103,500 to $114,000 for this model "old."

2. What might be thought paint on the lily was Dayton's statement that when he told him, Fultz "was not concerned."

3. Plaintiff attacks this finding. Since we find, post, that jurisdiction fails altogether for lack of due process, we do not reach this question, if it be one.

of any surprise to plaintiff or plaintiff's counsel.

That "assembly of the boat from the factory and commissioning of the boat," as Dayton had testified were done here, does not give rise to a maritime lien, goes back to *People's Ferry v. Beers*, 61 U.S. (20 How.) 393, 15 L.Ed. 961 (1857), and is such elemental law, *Thames Towboat Co. v. Schooner "Francis McDonald"*, 254 U.S. 242, 41 S.Ct. 65, 65 L.Ed. 245 (1920), that, as the court found, no admiralty practitioner could be ignorant of it. Yet, verified both by plaintiff—who, conceivably might be excused, particularly if so informed by counsel—and by counsel (twice) under penalty of perjury, it is said that the entire claim was a maritime lien. Not only was the district court told this apparent falsity, but so are we.

> [T]his is a simple maritime debt collection case ... [to] enforce its maritime lien. *Even if the plaintiff had at some time performed some nonmaritime services for the vessel, there was no evidence that such services were among or within the claims set forth in the Complaint!* (Emphasis and exclamation in original.)

> With all due respect, plaintiff's counsel suggests that the District Court had no grounds to comment disparagingly as if plaintiff's counsel misrepresented his case by omission of pertinent facts. The plaintiff still contends that its services were maritime in nature, as pleaded.

How it could be thought we would be taken in by this in the light of Dayton's undisputed contrary testimony, or even simply as a matter of common sense, passes comprehension. In what way could there have been post-completion work on the vessel— decommissioning and storing—within leagues of $31,000? Counsel is fortunate that the district court stopped with criticism and did not sanction him for a pleading "not well grounded in fact," and interposed for an "improper purpose." Fed.R. Civ.P. 11.

Nonsense as it was, there was a purpose. While the construction work could not create a maritime lien, it could create a state lien. The difficulty here was that prior to bringing an action for enforcement of such a lien there must be written notice to the debtor. Mass.G.L. c. 255, § 26. This was the last thing, it would seem, that plaintiff wished. Indeed, its charade was such that apparently it wanted enough time to elapse after the court approved the sale on August 5, that it would be too late for certain motions. Although, in order to obtain court approval, plaintiff had stipulated that approval would wipe out the debt, it thereafter billed Fultz for the entire amount on August 26. Manifestly, on that date Fultz should have received a receipt, not a bill. This was not a clerical error. Dayton had testified he billed Fultz through August.

There was a further problem from plaintiff's standpoint. To have disclosed that most of the claim was a state lien might have disturbed the court; as, indeed, it ultimately did.

■ We are troubled, however, by the court's finding, on Fultz's motion for relief, that it did not have subject-matter jurisdiction. As a general proposition nonmaritime matters may be combined in an admiralty complaint, on the basis of pendent jurisdiction, and not deprive the court of jurisdiction over the maritime claim, *Natasha, Inc. v. Evita Marine Charters, Inc.*, 763 F.2d 468 (1st Cir.1985), as long as clearly separable. There is difficulty with the court's finding that they were not separable here. The memorandum in which Fultz complained of unconstitutional lack of notice not only conceded that he owed for work subsequent to the launching— hauling, dismantling, and winter storage— but supplied the figures. However, Fultz must be correct as to lack of due process with respect at least to the nonmaritime claims included in this in rem proceeding. Not merely had plaintiff not given the preliminary requisite written notice and stated in the verified complaint that it had done so, but, whatever may have been adequate admiralty notice, post, due process for the nonmaritime lien required notice of suit to Fultz beyond mere publication. In the absence of at least a letter to his last known address, jurisdiction was lacking. *Mullane*

v. *Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Schroeder v. City of New York*, 371 U.S. 208, 212–13, 83 S.Ct. 279, 282–83, 9 L.Ed.2d 255 (1962).

■ Turning to the sufficiency of the notice for purely maritime liens, this, technically, plaintiff initially complied with. The peculiar nature of admiralty process, the personification of the ship, normally warrants posting notice thereon to be considered a fair equivalent to personal notice to her owner. Supplemental Rules for Certain Admiralty and Maritime Claims C(3); *Merchants Nat'l Bank v. Dredge Gen. G.L. Gillespie*, 663 F.2d 1338, 1345–46 (5th Cir.1981). This rule, however, is not so much based upon the fiction of personification as it is upon practicalities. The owner, or his representative, ordinarily is in charge of the vessel, and the owner can reasonably be presumed to receive the word. *Id.* at 1350. Plaintiff, in its brief, puts it well. "The process presumes that the vessel owner, through a master, agent or personal presence, will maintain reasonable contact with and continuing interest in the status and condition of his vessel." This is a constitutional presumption. The extent, surely minimal, that it may be rebutted need not be determined; it is, in this exceptional case. Plaintiff, as sole custodian, well knew that the owner was not about, and that posting the vessel was notice only to itself, and not to him. Even as applied to admiralty, this circumstance dictated that plaintiff, at least as between Fultz and itself as the purchaser at the sale,[4] make further effort to give personal notice necessary in order to satisfy constitutional due process. *Merchants Nat'l Bank*, 663 F.2d at 1350 ("[A]dmiralty law cannot, on the basis of historical tradition, escape the due process clause of the Fifth Amendment.") In mailing monthly bills throughout, conspicuously silent with regard to the admiralty proceedings, let alone the state lien as to which formal written notice was a statutory requirement, it is all too apparent that plaintiff's intent was to avoid giving notice, rather than to furnish it. We are not receptive to the claim that Fultz had "abandoned" the vessel, and that, "If Mr. Fultz did not actually know of his vessel's arrest and judicial sale, it was because of his intentional avoidance or negligent disregard of that information."

It follows that as a matter of constitutional due process, viz., elementary fairness to the owner of the vessel that was in plaintiff's custody and care, there was no jurisdiction for establishing even the maritime lien. Nor, since the vessel has departed the district, is there a possibility of repair. The court's vacating the default judgment must be confirmed. So, also, its dismissal of the complaint. Although, since there was no valid judgment between the parties to support the sale, it follows that plaintiff wrongfully converted the vessel, Fultz must have his damages assessed elsewhere.

■ Plaintiff's improper contentions on this appeal call for the assessment of double costs, and for a charge of partial counsel fees to Fultz in the amount of $2,500, to be paid by plaintiff's counsel personally.

*Affirmed.*

■■■■■■■■■■■■■■■■■■■■■■

---

**4.** Plaintiff raises the spectre of whether a default judgment so procured would mean that a bona fide purchaser of the vessel would not get title. We do not approach such waters.