881 F.2d 73
 1989 A.M.C. 2594
 Captain Manuel SALAZAR and the Crew of the Vessel "ATLANTIC
SUN" and Salem Port Authority, Intervenor,
and
Coast to Coast Trucking, Inc., Intervenor,
and
Harbor Petroleum, Inc., Intervenor,
and
The Pilots Association for the Bay and River Delaware, Intervenor,
v.
The "ATLANTIC SUN," Her Engines, Boilers, Tackle,
Appurtenances, etc., in Rem, and Atlantic Sun
Ltd., and Resolve Maritime Corp., in Personam.
Appeal of ATLANTIC SUN, LTD.
 No. 88-5979.
 United States Court of Appeals,
Third Circuit.
 Argued June 13, 1989.
Decided Aug. 3, 1989.
Rehearing Denied Aug. 29, 1989.
 
 Fredric J. Gross (argued), Fredric J. Gross Law Firm, Mount Ephraim, N.J., for appellant.
 R. Timothy Swiecicki (argued), Cichanowicz, Callan & Keane, New Providence, N.J., for appellees Captain Manuel Salazar and the Crew of the Vessel "Atlantic Sun".
 Francis X. Kelly (argued), Mattioni, Mattioni & Mattioni, Philadelphia, Pa., Stephen J. Galati, Mattioni, Mattioni & Mattioni, Westmont, N.J., for intervenor-appellee Marshall Enterprises, Ltd. and Salem Port Authority.
 Before SLOVITER, COWEN, and WEIS, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 In this admiralty case, we conclude that the shipowner has failed to substantiate its contention that the district court denied due process by failing to conduct a hearing following the arrest of a vessel. We are also persuaded that the owner waived any right it might have had to release the vessel on bond by not taking action until the day of the hearing to confirm the marshal's sale of the vessel. Accordingly, we will affirm the order of the district court confirming the sale.
 
 
 2
 Before docking at the port of Salem, New Jersey, a dispute had arisen between the captain and seamen aboard The Atlantic Sun and the ship's owner over alleged unpaid wages and the crew's failure to pick up cargo at a Brazilian port. After the vessel arrived at Salem, negotiations took place, but were unsuccessful.
 
 
 3
 At the instance of the captain, the district court ordered the ship arrested and ultimately set bond at $75,000. Apparently unable to secure a bond, the owner filed a petition in bankruptcy under Chapter 11. After a hearing, the bankruptcy judge lifted the automatic stay, and the district court scheduled a marshal's sale.
 
 
 4
 On the day set for sale, the owner presented a bond for $75,000, which the district court found defective in form and inadequate in amount because of increased charges resulting from the lapse of time. After the marshal's auction, the court set the time for a confirmation hearing. Near the conclusion of that hearing, the owner asked for a delay of two weeks to post a bond in the amount of $140,000, the high bid at the auction. The court denied the request, and instead confirmed the sale. When the owner did not present a supersedeas bond on the morning of the following day, the court refused a stay of confirmation. A panel of this Court denied a twenty-four hour stay.
 
 
 5
 On appeal, the owner argues that the sale should be set aside and the vessel returned. The owner asserts that the district court's failure to conduct an adversarial post-arrest hearing resolving challenges to the plaintiffs' claims amounts to a denial of due process and a violation of the Federal Rules of Civil Procedure. The owner also argues that the district judge denied it a reasonable opportunity to post a bond at the conclusion of the confirmation hearing.
 
 I.
 JURISDICTION
 
 6
 Preliminarily, we address the question of our jurisdiction. Because the district court did not adjudicate all issues involved in the parties' claims and counterclaims, the order appealed from is not final under 28 U.S.C. Sec. 1291. Although that might be fatal to appellate jurisdiction in most civil cases, special provisions apply in admiralty matters.
 
 
 7
 The Courts of Appeals have jurisdiction to review "[i]nterlocutory decrees of ... district courts ... determining the rights and liabilities of the parties to admiralty cases." 28 U.S.C. Sec. 1292(a)(3). For a district court order in admiralty to be appealable, it "need not determine all rights and liabilities of all parties." Kingstate Oil v. M/V Green Star, 815 F.2d 918, 921 (3d Cir.1987). Section 1292(a)(3), however, is not completely open-ended--the order appealed from "must conclusively determine the merits of a claim or defense." Kingstate Oil, 815 F.2d at 921. See Todd Shipyards Corp. v. Auto Transp., S.A., 763 F.2d 745, 751 (5th Cir.1985); Bankers Trust Co. v. Bethlehem Steel Corp., 761 F.2d 943, 945 n. 1 (3d Cir.1985); Gulf Towing Co. v. The Steam Tanker, Amoco New York, 648 F.2d 242, 244 (5th Cir. Unit B June 1981) (per curiam).
 
 
 8
 In the matter at hand, the order of confirmation ffectively terminated the owner's rights to title and possession of The Atlantic Sun. The order, therefore, comes within the ambit of 28 U.S.C. Sec. 1292(a)(3), and is properly before this Court.
 
 
 9
 Plaintiffs concede our jurisdiction over the confirmation order, but would limit our review to the circumstances of the sale itself, leaving to another day the owner's due process and other challenges. We think that approach impracticably narrow.
 
 
 10
 If the owner successfully establishes a due process violation in the district court's alleged failure to provide a post-arrest hearing, reversible error may have occurred, undermining the legitimacy of the sale. See Neapolitan Navigation, Ltd. v. Tracor Marine, Inc., 777 F.2d 1427 (11th Cir.1985). Consequently, the issues raised by defendant are inextricably intertwined with the validity of the sale, and are properly subject to review at this time. See Kershner v. Mazurkiewicz, 670 F.2d 440, 449 (3d Cir.1982) (in banc). We therefore exercise jurisdiction over all of the points raised in this appeal.
 
 II.
 DUE PROCESS
 
 11
 Arrest of a vessel is an in rem procedure in admiralty law having an ancient lineage. Utilized even before the Elizabethan era, it had become a dominating feature of admiralty practice by the nineteenth century. See generally F. Wiswall, The Development of Admiralty Jurisdiction and Practice Since 1800 155-208 (1970), noted in Merchants Nat'l Bank v. The Dredge Gen. G.L. Gillespie, 663 F.2d 1338, 1342 n. 8 (5th Cir. Unit A Dec.1981), cert. dismissed, 456 U.S. 966, 102 S.Ct. 2263, 72 L.Ed.2d 865 (1982).
 
 
 12
 Seizure of a vessel by court officials at the instance of a complainant serves the dual purpose of securing jurisdiction and providing a source for the satisfaction of a maritime lien. In the English view--the so-called "procedural" theory--the arrest of a vessel is intended to force the owner to appear so as to give the court in personam jurisdiction.[1] American courts, by and large, adopted a "personification" theory in which the vessel itself is a party and judgments are entered against her without the necessity of securing jurisdiction over the owner.
 
 
 13
 The Supreme Court in Tucker v. Alexandroff, 183 U.S. 424, 438, 22 S.Ct. 195, 201, 46 L.Ed. 264 (1902), described the personification theory in modern admiralty practice. See also United States v. The Little Charles, 26 F.Cas. 979, 981-82 (C.C.D.Va.1818) (No. 15,612) (Marshall, C.J., sitting as Circuit Justice). Although subjected to academic criticism, e.g., G. Gilmore & C. Black, The Law of Admiralty Sec. 9-3 (2d ed. 1975), the personification theory has provided a useful jurisprudential concept in formulating procedures for the arrest process where maritime liens are in existence.[2]
 
 
 14
 In 1844, the Supreme Court adopted the Rules of Practice in Causes of Admiralty and Maritime Jurisdiction, codifying in rem procedures then in practice. 44 U.S. (3 How.) iii-xiv (1844). The Court revised the rules in later years, and in 1966 admiralty practice was unified through amendments to the Federal Rules of Civil Procedure. Rules A-F of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Admiralty Rules") addressed the unique admiralty in rem action.
 
 
 15
 A few years later, common law in rem proceedings attracted the concern of the Supreme Court. In a series of decisions beginning with Sniadach v. Family Fin. Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), the Court outlined procedural due process requirements in attachment and garnishment, emphasizing particularly the need for a pre- or post-seizure hearing. See Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Mitchell v. W.T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); North Georgia Finishing, Inc. v. DiChem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975). In another opinion affecting traditional in rem procedures, the Court insisted on the presence of a defendant's minimum contacts with the forum, Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), a matter not at issue here.
 
 
 16
 None of these decisions by the Supreme Court arose in the admiralty context, and some federal courts reasoned that the unique historical and constitutional foundations of admiralty law may place maritime claims beyond the sweep of common law in rem cases. See, e.g., Merchants Nat'l Bank, 663 F.2d at 1345-46; Amstar Corp. v. S/S Alexandros T., 664 F.2d 904, 911-12 (4th Cir.1981). At least two district courts, however, considered procedures under the Supplemental Admiralty Rules to be suspect. Alyeska Pipeline Serv. Co. v. The Vessel Bay Ridge, 509 F.Supp. 1115, 1120 (D.Alaska 1981), appeal dismissed, 703 F.2d 381 (9th Cir.1983), cert. dismissed, 467 U.S. 1247, 104 S.Ct. 3526, 82 L.Ed.2d 852 (1984); Karl Senner, Inc. v. M/V Acadian Valor, 485 F.Supp. 287, 295 (E.D.La.1980).
 
 
 17
 In Merchants National Bank, the Court of Appeals commented that local rules making a prompt post-seizure hearing available on request would cure any alleged constitutional defects in the arrest procedure. Where no such local rules exist, the Court declared that "every Admiralty Court has the inherent power to assure the protections contemplated." Merchants Nat'l Bank, 663 F.2d at 1344.
 
 
 18
 Despite the existence of local rules in many districts, the Maritime Law Association,[3] concerned about the uncertainty over due process in attachment and arrest cases, presented to the Advisory Committee on Civil Rules proposals to amend Supplemental Admiralty Rules B, C, D, and E of the Federal Rules of Civil Procedure. These suggestions resulted in the 1985 adoption of amendments to the admiralty rules, providing for pre- and post-seizure procedures. In addition to these rules, many district courts, including New Jersey, have adopted complementary local rules.
 
 
 19
 We narrow our discussion to the Rules specifically addressing arrest procedures--Supplemental Admiralty Rules C and E and New Jersey Local Admiralty Rule (e). Supplemental Admiralty Rule C(3) provides that a complaint seeking the arrest of a vessel is to be reviewed by the court before a warrant is issued. Rule E(4)(f) states, with exceptions not pertinent here, that after an arrest, "any person claiming an interest in [the ship] shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest ... should not be vacated or other relief granted." In the District of New Jersey, Local Admiralty Rule (e)(8) ensures that "[a]n adversary hearing following arrest ... be conducted by the Court within three (3) court days after a request for such hearing, unless otherwise ordered."
 
 
 20
 Supplemental Admiralty Rule E(5)(a) permits the owner to secure the release of its vessel by posting a bond in an amount stipulated by the parties, or if they are unable to agree, in an amount fixed by the court that is "sufficient to cover the amount of the plaintiff's claim fairly stated with accrued interest and costs." The Supplemental Rules authorize the court to direct an interlocutory sale if the vessel is subject to deterioration, the expense of keeping her is disproportionate, or "if there is unreasonable delay in securing [her] release." Fed.R.Civ.P.Supp.Adm.R. E(9)(b).
 
 
 21
 Not specifically mentioned in the rules, but frequently used, is the plaintiff's agreement to the release of a vessel on the promise of the owner or its counsel to deliver a so-called Letter of Undertaking. This document is an agreement that the owner will enter an appearance, acknowledge ownership, and, whether the vessel be lost or not, pay any final decree entered against the ship. See Continental Grain Co. v. Barge FBL-585, 364 U.S. 19, 29, 80 S.Ct. 1470, 1476, 4 L.Ed.2d 1540 (1960) (Whittaker, J., dissenting); McCreary, Going for the Jugular Vein: Arrests and Attachments in Admiralty, 28 Ohio St. L.J. 19, 31 (1967).
 
 
 22
 With this general review of arrest procedures as background, we then come to the owner's assertion that the district court in this case did not conduct a post-arrest hearing. This contention requires some further discussion of the facts.
 
 
 23
 The dispute over wages had been simmering for some weeks before The Atlantic Sun arrived at Salem, New Jersey, on June 30, 1988. The next day, the district court reviewed the plaintiffs' complaint, then ordered the clerk to issue a warrant for the arrest of the vessel. On that same day, plaintiffs gave telephone notice of the action to Resolve Maritime Corporation, the owner's agent. Plaintiffs followed this with a letter dated July 5, detailing their claims. During the period between July 1 and July 14, the president of Atlantic Sun, Ltd., personally held direct negotiations with the ship's captain and crew, in fruitless efforts at settlement.
 
 
 24
 On July 27, the law firm of DeOrchis & Partners entered its appearance for Atlantic Sun, Ltd., and filed a claim of ownership. The following day Resolve Maritime filed on behalf of the owner, an eight-page affidavit narrating at length the history of the dispute and attempts at settlement, presenting various defenses, and suggesting a bond in the amount of $7,000.
 
 
 25
 The district court record includes a "Minutes of Proceedings" entry, showing that on August 5, 1988, plaintiffs' counsel and attorneys from DeOrchis & Partners appeared before the court on the return day for "O. to S.C. Why a P.I. Should Not Issue" (presumably, order to show cause why a preliminary injunction should not issue). The Minutes document that a court reporter was present, and that the district judge "ordered O. to S.C.--Denied--Order to be submitted." The owner did not have the proceedings transcribed, and the deputy clerk's notes are the only record we have of what transpired that day.
 
 
 26
 On August 15, 1988, the owner filed an answer and counterclaim. One week later, plaintiffs' counsel filed an affidavit outlining in detail the claim for wages, custodia legis expenses, and requesting a bond in the amount of $200,000. On August 23, the owner responded with a "Memorandum for Defendant Regarding the Amount of Bond."[4]
 
 
 27
 On the following day, August 24, 1988, the district court entered an order "[o]n application of the plaintiffs and upon the papers submitted, concerning the amount of bond." The order set bond at $75,000 and directed the sale of The Atlantic Sun on September 12, unless the owner posted a bond within five days of its receipt of the order. The court later extended the date of the sale first to September 19, then to September 23, and finally to November 9.
 
 
 28
 On August 25, DeOrchis & Partners withdrew as counsel, and the Fredric J. Gross Law Firm entered its appearance for the owner. The owner, through Mr. Gross, filed an Emergency Petition for a Writ of Prohibition in this Court on September 7, 1988, which was denied two days later.
 
 
 29
 On September 20, 1988, the owner filed a petition under Chapter 11 of the Bankruptcy Code, thereby invoking the automatic stay of all proceedings. After conducting an evidentiary hearing on September 28, the bankruptcy judge denied the plaintiffs' motions for relief from the automatic stay and for dismissal of the bankruptcy petition. To ensure adequate protection of the plaintiffs' interest in the vessel, however, the bankruptcy judge conditioned continuation of the stay on the posting of the $75,000 bond by October 11.
 
 
 30
 When the owner failed to secure a bond, the bankruptcy court lifted the stay on October 25, and the district court set the sale of the vessel for November 9, 1988. On that day, approximately an hour before the auction was to commence, the owner presented a bond for $75,000, which the court rejected as inadequate. The auction took place, and the marshal accepted the highest bid of $140,000.
 
 
 31
 This lengthy recitation of only some of the procedural skirmishing that marked the progress--or more aptly, the lack of it--in this case is necessary to put in proper context the owner's alleged deprivation of a hearing. When the brief asserts a denial of "even the most rudimentary hearing," Appellant's Brief at 24, or "any post-arrest hearing whatsoever," id. at 2, the owner's failure to provide a transcript of the August 5, 1988 proceeding before the district judge is curious indeed. Although the owner attempts to dismiss that proceeding as nothing more than an informal conference in chambers, the courtroom deputy's notation that the court denied an order to show cause would indicate that matters of substance were addressed. It is also a fair assumption that the parties discussed the bond amount and the owner's defenses at the August 5 proceeding. By that time, the detailed affidavit submitted by the owner was in the record.
 
 
 32
 The owner's argument on this appeal that the district court disposed of the case without a hearing or consideration of the necessary facts is a departure from its previous statements made in appeals to this Court. In its September 7, 1988 Emergency Petition for a Writ of Prohibition, the owner complained that the district judge did not explain the basis on which he set bond at $75,000. The owner speculated: "Presumably, [the district court] either rejected compelling proofs that the arrest had been improvident and the underlying claims specious, or it acted in the ... erroneous view that it ... must specially favor wards of admiralty...." Emergency Petition of Atlantic Sun, Ltd., for a Writ of Prohibition at 3. Thus, the owner itself confesses that evidence it considered at least "compelling" had been submitted to the district court.
 
 
 33
 Also in the petition, the owner acknowledged that from July 14 to August 24 the parties had attempted to agree on a bond amount, and that "[t]he district court was kept advised of the total lack of progress in these negotiations." Id. at 14 n. 14. It is remarkable, too, that in light of the owner's present emphasis on the lack of a post-arrest hearing, not one word referring to such an alleged deprivation was included in the Petition for a Writ of Prohibition, although all other bases were covered.
 
 
 34
 The district court record contains no entry showing that the owner requested a prompt post-arrest hearing--other than the August 5 proceeding--in which to submit other matters to the court. Supplemental Admiralty Rule E(4)(f) and Local Admiralty Rule (e)(8) state that the person claiming an interest is entitled to a hearing, but do not relieve the individual from asking for one. No such request appears in the record here.
 
 
 35
 To summarize, the owner had notice of the suit against the vessel on July 1, 1988, and filed a detailed defense on July 28, before counsel appeared in a court proceeding on August 5. Thereafter, counsel for both parties submitted memoranda before the district court fixed the bond amount on August 24.
 
 
 36
 It is pertinent that the owner has failed to present any evidence that the August 5, 1988 proceeding did not constitute a post-arrest hearing. What transpired that day could have been documented by the owner, which as appellant has the responsibility for presenting the full record on appeal. See Fed.R.App.P. 10(b)(1) ("the appellant shall order from the reporter a transcript of such parts of the proceedings not already on file as the appellant deems necessary").
 
 
 37
 Where no transcript of a hearing is prepared, Fed.R.App.P. 10(c) allows the appellant to "prepare a statement of the ... proceeding[ ] from the best available means, including the appellant's recollection." The owner has not done so here. Moreover, we deem it significant that the owner's original counsel who were before the court on August 5, 1988 have not filed an affidavit or any other document asserting that the proceedings were not considered a post-arrest hearing or a satisfactory equivalent. Cf. Bilmar Drilling, Inc. v. IFG Leasing Co., 795 F.2d 1194, 1200 (5th Cir.1986) (mere recital by counsel of what happened during pre-trial conference is not enough).
 
 
 38
 The Supplemental Admiralty Rules do not specify what form the post-arrest hearing must follow. Consequently, the type of proceeding is left to the discretion of the district court. Whether a full adversary hearing with testimony and cross-examination of witnesses in open court is necessary depends on the nature of the issues in controversy.
 
 
 39
 The post-arrest hearing is not intended to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant, and if so, to fix an appropriate bond. Generally speaking, an exhaustive adversarial hearing is not necessary for resolution of those issues. Thus, in many instances we would expect that an informal proceeding, perhaps in the nature of a conference before the district court, supplemented by affidavits and legal memoranda as directed by the court might be sufficient.
 
 
 40
 It should be obvious at this point that a record should be made of whatever post-arrest hearing the district court may deem necessary under the circumstances. Where there is no record of a hearing or a summary of the necessary facts or evidence that the parties stipulated to certain facts, the appellate court is severely hampered in its review.
 
 
 41
 We are persuaded that the owner has not demonstrated that it was deprived of a post-arrest hearing. First, the owner failed to produce record evidence that the August 5 proceeding was not in fact an appropriate hearing. Second, although admitting that it had presented compelling proofs to the district court, the owner has not brought to our attention what other evidence it would have presented there, and thus has not demonstrated that injury has occurred. Finally, the owner did not comply with the Supplemental and Local Admiralty Rules by requesting another hearing, if in its view, the August 5 proceeding did not meet the requirement of the post-arrest hearing to which it was entitled. We also note that the district court reviewed the request for arrest before directing the clerk to issue a warrant. See Mitchell, 416 U.S. at 616-17, 94 S.Ct. at 1904-05.
 
 
 42
 Consequently, we reject the owner's claim of denial of due process.
 
 III.
 THE BELATED OFFER TO POST BOND
 
 43
 The owner's second argument on appeal is that "[t]he owner of property seized in rem must be given a reasonable opportunity to obtain and post a release bond." Appellant's Brief at 28. As stated, the point might well be sustained. As the facts demonstrate, however, what is urged here is that after an auction has been held, an owner has the absolute right to possession of its vessel upon posting a bond equal to the amount of the highest bid. The owner cites no controlling authority for that proposition, but instead relies on two district court decisions that are not on point--Gerard Constr. Co. v. Motor Vessel Virginia, 480 F.Supp. 488 (W.D.Pa.1979), and Fair Ocean Co. v. Cargo of the Permina Samudra XII, 423 F.Supp. 1037 (D.Guam 1976).
 
 
 44
 In effect, the owner is asking this Court to import into admiralty in rem proceedings a maritime version of the right of redemption familiar in the area of residential mortgage law. In the abstract, the idea is not without appeal. The central purpose of the arrest procedure, after all, is to provide the plaintiff with a means for satisfying his maritime lien. But penalizing the shipowner by wresting resources beyond those needed to meet a plaintiff's claim is neither helpful to commerce nor consistent with equitable considerations that influence admiralty jurisprudence.
 
 
 45
 Determining the shipowner's right to possession of its vessel by providing security for satisfaction of the plaintiff's lien, but yet giving due consideration to the bidder's position, is a task squarely within the discretionary powers of the court sitting in admiralty. Buoying up this point, Judge Brown wrote, "The Chancellor is no longer fixed to the woolsack. He may stride the quarter-deck of maritime jurisprudence and, in the role of admiralty judge, dispense, as would his landlocked brother, that which equity and good conscience impels." Compania Anonima Venezolana de Navegacion v. A.J. Perez Export Co., 303 F.2d 692, 699 (5th Cir.), cert. denied, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (1962).
 
 
 46
 Generally speaking, a ship at auction will bring less than its actual value and less than replacement costs. Consequently, in many instances, the shipowner may emerge from a judicial sale with losses substantially in excess of the amount needed to satisfy the maritime lien. The party profiting in that situation is not the plaintiff who receives no more than his due, but the successful bidder at the auction who receives the vessel at a bargain price.
 
 
 47
 That is not to say that the successful bidder's interests are not worthy of consideration. As the Court of Appeals remarked in Munro Drydock, Inc. v. M/V Heron, 585 F.2d 13, 14 (1st Cir.1978), "The policy of inspiring confidence in sales under the supervision of the court favors confirmation of a sale made to the highest bidder at a fairly conducted public auction." Recognizing that the purpose of a judicial sale is to benefit both creditors and debtors, courts must heed the aphorism that "[a]uctions should not be empty exercises." First Nat'l Bank v. M/V Lightning Power, 776 F.2d 1258, 1261 (5th Cir.1985).
 
 
 48
 Nevertheless, the bidder at a sale is merely an offeror and has no rights to possession of the ship until the court's acceptance through the confirmation process. Puget Sound Prod. Credit Ass'n v. Oil Screw Johnny A., 819 F.2d 242, 246 (9th Cir.1987) (quoting The East Hampton, 48 F.2d 542, 544 (2d Cir.1931)). Giving the owner the opportunity to match the successful bid might well dampen the enthusiasm of prospective bidders, but is not likely to pose a formidable barrier to successful auctions. The history of mortgage redemption procedures would seem to provide adequate assurances on that score.
 
 
 49
 We do not overlook the fact that on two occasions, the owner failed to post a bond within the time set by court orders, and may thereby have waived its right to release of the vessel. We, however, choose not to steer that course here.
 
 
 50
 Having concluded that the owner's theory of a quasi right of redemption theory may have some merit, we assume, but only arguendo, its legitimacy. We next consider whether in the circumstances present here, such a right should be enforced. As noted before, the successful bidder at a judicial auction is in the position of an offeror, but becomes the owner of the vessel when the bid is accepted at confirmation. If the sale is held valid, the previous owner has no further interest in the property and the claims are transferred to the fund created. The sale price thus substitutes for the vessel as the res.
 
 
 51
 It follows that if the owner wishes to redeem the vessel, that action must take place, at the very latest, before confirmation of the sale. Because the owner's redemption would prevent--and is thus an obstacle to--confirmation, the intent to exercise any such right must be made known to the court in the form of an objection in advance, as is true with other challenges to the regularity of the sale.
 
 
 52
 Some elaboration of the facts is helpful at this point. After the court set bond at $75,000 in its August 24, 1988 order, plaintiffs asked, on September 1, that the amount be increased to $200,000. The district court did not act on this request. In rejecting the owner's offer to post $75,000 on November 9, 1988, the date set for the auction, the district court explained that "the passage of time and the play of events had rendered what may always have been an inadequate bond now hopelessly insufficient to cover plaintiffs' claims." Specifically, the court concluded that the plaintiffs' claim for penalty wages, although hotly contested, was "not as a matter of law foreclosed," and that administrative fees occasioned by the vessel's in custodia legis status had increased substantially. On November 10, 1988, the day following the auction, plaintiffs moved for an order to show cause why the bond should not be increased to $356,000.
 
 
 53
 Local Admiralty Rule (e)(12)(e) requires an interested person objecting to a sale to file a writing within three days following the sale and to deposit with the marshal an amount sufficient to pay the vessel's custodial expenses for at least one week. The owner here failed to do so, and thus the district judge held that it had no standing to contest confirmation. A disappointed bidder, however, did file an objection and the court scheduled a hearing. The judge then allowed testimony on alleged defects in the bidding procedure asserted by the disappointed bidder. After hearing the evidence, the district court rejected the objection and confirmed the sale.
 
 
 54
 During the same hearing on November 17, 1988, the court, acting on the plaintiffs' motion, decided that the bond should be raised to $140,000. This amount, the highest bid at the sale, represented the best record evidence of the value of the vessel. When the court inquired of the plaintiffs' counsel why it requested an increase of the bond after the auction, counsel explained that the purpose was to prevent the owner from making a claim for proceeds of the sale in excess of the $75,000 bond.
 
 
 55
 Toward the conclusion of the hearing, the owner asked for two weeks in which to raise the bond. The court denied this request, as well as one for a shorter period. The court instead stated that it would confirm the sale, but granted the owner until noon the following day to post a bond as a condition for a stay of confirmation pending appeal. When on the following morning the owner requested a further extension until 4:00 p.m. that day to post a bond--not as a supersedeas--but for the release of the vessel, the court refused. The court explained, "Vindication of the legitimate rights of the successful bidder on the vessel and of the legitimacy of a properly conducted judicial sale, coupled with the Court's familiarity with the long history of delays in this case, informed our denial of defendant's request."
 
 
 56
 Although in most cases one could expect the court to give an owner some time to post a bond, circumstances here were not of the usual nature. Granting the owner the right to post a release bond after confirmation would be, in effect, an abrogation of the confirmation proceeding. Because it had filed no objection, the owner had no standing at the time of the hearing to post a bond, and consequently, properly was not given time to do so.
 
 
 57
 The order raising the bond at that stage was probably unnecessary. The same result could have been more appropriately effected by the plaintiffs' requesting the court to deny any withdrawals from proceeds of the sale in the court's registry pending further examination of the actual amounts of the claims in controversy. The court had already decided that the $75,000 amount was inadequate; plaintiffs, therefore, need not have feared that the court would release to the owner any sums in excess of that amount without additional review. The situation here was quite unlike the instance where, absent fraud in appraisement or posting of a bond, a court loses the power to increase the bond on a vessel once it has been released on providing security. See The Haytian Republic, 154 U.S. 118, 126, 14 S.Ct. 992, 994, 38 L.Ed. 930 (1894); United States v. Ames, 99 U.S. 35, 41-42, 25 L.Ed. 295 (1878).
 
 
 58
 Because we conclude that the owner had waived its right to release of the vessel upon posting of a bond, we find no error in the district court's decision to confirm the sale rather than to grant additional time to the owner.
 
 
 59
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 The leading English decision pronouncing this theory is The Dictator, [1892] P. 304. A critical review of The Dictator, particularly its historical argument, appears in F. Wiswall, The Development of Admiralty Jurisdiction and Practice Since 1800 159-62 (1970)
 
 
 [2]
 In suits alleging personal injury, however, Judge Hastie wrote that this Court has "looked through the fiction of 'the so-called independent personality of the ship' and recognized that 'an action against the vessel is realistically an action against' the owner." Reed v. Steamship Yaka, 307 F.2d 203, 205 (3d Cir.1962), rev'd on other grounds, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963)
 
 
 [3]
 The Maritime Law Association of the United States is an organization of lawyers interested in the administration and reform of maritime law. Its membership includes counsel who represent shipowners, cargo-shippers, personal injury and wrongful death claimants, as well as underwriters
 
 
 [4]
 This document is missing from the record, but its existence is admitted by the owner's Emergency Petition for a Writ of Prohibition, filed in this Court on September 7, 1988